UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

\*\*\*

UNITED STATES OF AMERICA,

          Plaintiff,

vs.

ROBERT LEE GIBSON,

          Defendant.

Case No. 2:16–cr–333–JAD–VCF

**REPORT AND RECOMMENDATION**

Before the court are Gibson's motion to suppress (ECF No. 15), the Government's response (ECF No. 23), and Gibson's reply (ECF No. 30). The court also considered Gibson's supplement (ECF No. 38) and the Government's supplement (ECF No. 39). For the reasons stated below, Gibson's motion should be granted.

**I. Background**

On October 29, 2016, Las Vegas Metropolitan Police (Metro) Officers Orton and Dannenberger stopped a green Ford F-150 with Wyoming license plates. (ECF No. 25) Officer Dannenberger was wearing a body camera, which recorded the most of the encounter.[1] Officer Dannenberger ran the truck's license plate number through their patrol car's mobile data terminal.[2] The system checked the license plate number against Wyoming Department of Motor Vehicles. According to the system, the license plate was expired and was registered to a Honda Accord. Officer Orton testified that in addition to the expired plates, she suspected that the license plates or the truck may have been stolen.

---

[1] Officer Dannenberger testified that he switched his camera on and off multiple times during the encounter. This left the parties and the court with a series of video clips that depict certain portions of the encounter.
[2] A mobile data terminal is an onboard computer located in Metro patrol vehicles. It allows officers to verify information, conduct background checks, and complete other investigatory tasks in the field.

1

Unknown to the officers at the time, the Wyoming Department of Motor Vehicles maintains a separate data base for trucks. Wyoming truck license plate numbers must be entered into the system in a different manner than other Wyoming plate numbers in order to return accurate information. Officer Dannenberger entered the F-150's license number in the standard fashion, which is why the plate was shown as expired and registered to a Honda Accord. Later on in the encounter, Metro dispatch ran the plate number correctly. This showed that the registration was current and that the number was associated with an F-150 truck.

Officer Orton approached the driver, Joyce Frazier. Frazier could not locate her proof of insurance or registration for the truck. Officer Orton instructed Frazier to wave her paperwork outside the driver's side window, if she located it.

Officer Dannenberger approached the passenger, Defendant Robert Lee Gibson. (ECF No. 25) Officer Dannenberger asked Gibson for identification, about his criminal history, and if there was a firearm in the car. (*Id.*) Gibson provided a voided Nevada driver's license as well as his social security card. (*Id.*) Gibson also informed the officer that he was on federal probation. (*Id.*)

Officer Orton performed a records check on Frazier and Gibson. Officer Dannenberger stood several feet away from the patrol car facing the truck. (*Id.*) While the records check was being conducted, Frazier opened the driver side door and waved a piece of paper at the officers. (*Id.*) Officer Orton warned Frazier not to exit the vehicle. (*Id.*) Approximately three minutes elapsed between Officer Orton beginning her records check and Frazier being ordered to remain in the truck. (*Id.*)

Frazier ignored Officer Orton's instructions and exited the truck. (*Id.*) Gibson immediately moved into the driver's seat, put the truck in reverse, and revved the engine. (*Id.*) Officer Dannenberger ran to the passenger side window, drew his weapon, and ordered Gibson to place his hands on the dash. (*Id.*) Gibson was then ordered out of the vehicle and placed under arrest. (*Id.*)

2

Shortly thereafter, Metro Officers Lane and Randall arrived on scene to assist Officers Orton and Dannenberger.  After assistance arrived, Officer Dannenberger decided to impound the truck and to conduct an inventory search.  While Gibson was handcuffed in the back of a patrol car, Officer Lane asked Gibson a series of questions.  Officer Lane characterized Gibon's responses as evasive and non-responsive.  The last question was, "Is there anything in the truck we should know about?"  Gibson did not respond to the question.  Instead he looked away from Officer Lane and towards the F-150.  When he saw Officers Dannenberger and Randall approaching the truck to begin their inventory search, he blurted out, "Everything in the truck is mine."

Officer Lane did not Mirandize Gibson before this exchange and he did not ask any other officer if he or she had Mirandized Gibson.

Officers Dannenberger and Randall conducted an inventory search of the truck.  Officer Randall searched the driver's area, while Office Dannenberger searched the passenger's area.  The officers first searched the front cab area.  Officer Randal removed the truck's fuse box, while Officer Dannenberger looked through the glove compartment.  Eventually, Officer Dannenber removed the glove compartment from the dashboard in order to search the cavity behind it.

The officers moved from the front cab area to the rear cab area.  Officer Dannenberger perform a cursory search of some clothing hanging on the rear cab door, then moved on to search an open tool bag.  At the bottom of the bag, Officer Dannenberger discovered a zip lock bag containing .50 caliber handgun ammunition.  Meanwhile, Officer Randall discovered a .50 caliber handgun in a holster under the driver's seat.

Once Officer Randall discovered the handgun, the officers stopped the inventory search and called detectives from Metro's firearm team.  At no time during the search did either officer write down the items they discovered.  The officers did not relay the information to another officer to write down,

3

nor did they use their body cameras to make an audio-visual record of the items they discovered. Officer Randall testified that it was his practice to simply memorize the items he found during inventory searches and record them on Metro's impound sheet at a later time. Officer Lane began to complete an impound sheet, but stopped once the handgun was discovered. According to Officer Lane, this sheet only documented items found in the truck bed. The incomplete sheet was later destroyed.

A records check on the handgun revealed that it was stolen. Based on Gibson's statements, officers charged him with possession of a stolen handgun.

On November 15, 2016, Gibson was indicted on one count of being a felon in possession of a firearm. (ECF No. 1)

## II. Discussion

1. <u>Metro Officers May Have Had Reasonable Suspicion to Stop the F-150</u>

"For the duration of a traffic stop, … a police officer effectively seizes everyone in the vehicle, the driver and all passengers." *Arizona v. Johnson*, 555 U.S. 323, 327, 129 S.Ct. 781, 172 L.Ed.2d 694 (2009).

"A police officer needs only reasonable suspicion in the context of investigative traffic stops." *United States v. Miguel*, 368 F.3d 1150, 1153 (9th Cir. 2004). "Reasonable suspicion is formed by specific, articulable facts which, together with objective and reasonable inferences, form the basis for suspecting that the particular person detained is engaged in criminal activity." *United States v. Lopez-Soto*, 205 F.3d 1101, 1105 (9th Cir. 2000).

The Ninth Circuit has "distinguished between mistakes of fact and mistakes of law when an officer has initiated a traffic stop based on a mistaken belief." *Miguel*, 368 F.3d at 1153. "[I]f an officer makes a traffic stop based on a mistake of law, the stop violates the Fourth Amendment." *United States v. Twilley*, 222 F.3d 1092, 1096 (9th Cir. 2000). "A mere mistake of fact will not render a stop illegal, if

the objective facts known to the officer gave rise to a reasonable suspicion that criminal activity was afoot." *United States v. Mariscal*, 285 F.3d 1127, 1131 (9th Cir. 2002). "[A]n officer's correct understanding of the law, together with a good-faith error regarding the facts, can establish reasonable suspicion." *United States v. King*, 244 F.3d 736, 739 (9th Cir. 2001).

In *Miguel*, police officers' mistaken belief that a vehicle's registration was expired supported reasonable suspicion. 368 F.3d at 1154. Officers had stopped the defendant's vehicle for expired registration. *Id.* In coming to this conclusion, the officer relied on exclusively on information provided to them by their law enforcement computer. *Id.* The computer checked the license plate against Department of Motor Vehicle records. *Id.* These records indicated that the defendant's vehicle registration was expired. *Id.* In reality, the defendant had renewed his registration the week before, but the department's records had not updated to reflect the renewal. *Id.*

The Ninth Circuit held that the officers reasonably and in good faith relied on the information from the department. *Id.* Whether a vehicle's registration was expired was a question of fact and the officers' reasonable, good-faith mistake as to this fact did not eviscerate reasonable suspicion. *Id.*

Here, Metro officers had reasonable suspicion to stop the F-150. Based on information from their mobile data terminal, they believed that the truck had expired license plates and that the plates, or the truck, was possibly stolen. Although this information was later proved to be incorrect, the officers were entitled to rely on this information when forming the basis for reasonable suspicion. *See id.* Like in *Miguel*, the officers' mistake regarding the validity of the truck's license plate was a mistake of fact, not one of law. *Id.* The officer knew that driving a motor vehicle without current registration was a crime in the state of Nevada. NRS 482.545. This belief was sufficient basis to conduct a traffic stop. *Miguel*, 368 F.3d at 1154.

The court is also convinced that Officer Orton's belief was formed in good faith and was reasonable.  At the time of stop, Officer Orton had been a Metro officer for approximately one year and was still being overseen by more experienced officers, in this instance by Officer Dannenberger.  Officer Orton credibly testified that this stop was her first encounter with a Wyoming license plate and she was not aware of the correct procedure for running a Wyoming truck plate.  Indeed, Officer Orton required the assistance of a Metro dispatcher to properly run the F-150's license plate number.  Based on these facts, the officers had reasonable suspicion to conduct a traffic stop.

2.      Officers Did Not Unreasonably Prolong the Traffic Stop

Gibson argues that the traffic stop amounted to an unreasonable seizure because Metro officers took no actions to determine if the F-150's license plates were expired.  (ECF No. 15)  Gibson cites two lines of inquiry that allegedly prolonged the stop: questions about his criminal history and notification that providing false information to police was a felony.  (ECF No. 30)  He argues that these questions were wholly unrelated to the purpose of the stop and served to unreasonably prolong it while the officers conducted an investigation into general criminal wrongdoing.  (*Id.*)

"[A] seizure that is lawful at its inception can violate the Fourth Amendment if its manner of execution unreasonably infringes interests protected by the Constitution."  *Illinois v. Caballes*, 543 U.S. 405, 407, 125 S.Ct. 834, 837, 160 L.Ed.2d 842 (2005).  "A seizure that is justified by the interest in issuing a warning ticket to the driver can become unlawful if it is prolonged beyond the time reasonably required to complete that mission."  *Id.*

"Because addressing the infraction is the purpose of the stop, it may last no longer than is necessary to effectuate th[at] purpose." *Rodriguez v. United States*, ─── U.S. ───, 135 S.Ct. 1609, 191 L.Ed.2d 492 (2015)(internal quotations omitted).  "Authority for the seizure thus ends when tasks tied to the traffic infraction are—or reasonably should have been—completed."  *Id.*

"Beyond determining whether to issue a traffic ticket, an officer's mission includes ordinary inquiries incident to [the traffic] stop." *Id.* (internal quotations omitted). "Typically such inquiries involve checking the driver's license, determining whether there are outstanding warrants against the driver, and inspecting the automobile's registration and proof of insurance." *Rodriguez*, 135 S.Ct. at 1609.

"Normally, the stop ends when the police have no further need to control the scene, and inform the driver and passengers they are free to leave." *Johnson*, 555 U.S. at 327, 129 S.Ct. 781. "An officer's inquiries into matters unrelated to the justification for the traffic stop … do not convert the encounter into something other than a lawful seizure, so long as those inquiries do not measurably extend the duration of the stop." Id. "The critical question, then, is not whether the [additional inquiry] occurs before or after the officer issues a ticket, … but whether [the inquiry] 'prolongs' —i.e. adds time to— 'the stop.'" *Rodriguez*, 135 S.Ct. at 1616; *see also Caballes*, 543 U.S. at 409, 125 S.Ct. 834.

Approximately 7 minutes elapsed between the beginning of the traffic stop and Gibson's escape attempt. (ECF No. 25) Officer Orton had only been performing record checks for approximately 3 minutes before Puckett tried to leave the truck. In the 3 minutes Officer Orton spent running records checks, she had not decided how to conclude the traffic stop. *Johnson*, 555 U.S. at 327, 129 S.Ct. 781. Without this clearly defined end to the traffic stop, or evidence showing when the stop should have ended, the court concludes that the officers did not unreasonably prolonged the stop. *Rodriguez*, 135 S.Ct. at 1616. This is true even if the additional inquiries were wholly unrelated to the original purpose of the stop. *Johnson*, 555 U.S. at 327, 129 S.Ct. 781.

/// /// ///

3.      Gibson Has Standing to Challenge the Search of the Vehicle[3]

Gibson argues that the search of the truck violated his Fourth Amendment rights.  (ECF No. 15) The Government contends that Gibson was merely a passenger and thus lacks standing to challenge the vehicle search.  (ECF No. 23)

In the context of the Fourth Amendment, "standing" refers to an individual's ability to contest the validity of a search.  *Twilley*, 222 F.3d at 1095.  In order to have standing to challenge a search, "the defendant must establish that he or she had a legitimate expectation of privacy in the place searched or the property seized."  *United States v. Kovac*, 795 F.2d 1509, 1510 (9th Cir. 1986)(internal quotations omitted).  "Because Fourth Amendment rights are personal and may not be vicariously asserted, as a general rule, only the owner of the vehicle or an individual with a legitimate privacy interest in the vehicle may challenge an allegedly illegal search."  *United States v. Wanless*, 882 F.2d 1459, 1462 (9th Cir. 1989).

"A reasonable expectation of privacy may be shown 'either by reference to concepts of real or personal property law or to understanding that are recognized and permitted by society."  *United States v. Thomas*, 447 F.3d 1191, 1197 (9th Cir. 2006)(quoting *Minnesota v. Carter*, 525 U.S. 83, 88, 119 S.Ct. 469, 142 L.Ed.2d 373 (1998)).  "Therefore, a defendant who lacks an ownership interest may still have standing to challenge a search, upon a showing of 'joint control' or 'common authority' over the property searched."  *Id.*  "Common authority rests 'on mutual use of the property by persons generally having joint access or control for most purposes.'"  *Id.* (quoting Illinois v. Rodriguez, 497 U.S. 177, 181, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)).

---

[3] Gibson also argues that his statement, "Everything in the car is mine," demonstrated that he had a legitimate expectation of privacy in the truck.  (ECF No. 15)  However, "the mere fact that [the defendant] 'claimed ownership' of the gun does not confer standing upon him to seeks its suppression."  *United States v. Pulliam*, 405 F.3d 782, 786 (9th Cir. 2005).

There is no dispute that Gibson was not the owner or the initial driver of the truck. Ordinarily, these facts would deprive him of standing to challenge the search of the truck. *Twilley*, 222 F.3d at 1095 ("As a passenger, Twilley has no reasonable expectation of privacy in a car that would permit [his] Fourth Amendment challenge to a search of the car.")

The facts of this case, however, present an unusual standing question. At the evidentiary hearing, Frazier credibly testified to the following facts: 1) she had known Gibson for about two weeks prior to the traffic stop; 2) Gibson was a friend of her brother, Donald Puckett; 3) she allowed Gibson to use her truck on the condition that he drive her to work every day; 4) apart from giving Frazier rides to and from work, Gibson had unrestricted use of the truck; and 5) Gibson used the truck to collect and store his belongings.

Based on these uncontested facts, the court finds that Gibson had a reasonable expectation of privacy in the truck. *United States v. Johns*, 851 F.2d 1131, 1136 (9th Cir. 1988) (holding that individual who kept belongings in a storage unit and paid a portion of the rent had standing to challenge the search of the unit despite not being on the lease agreement). Gibson's arrangement with Frazier demonstrates that the two had "joint control" over the F-150. While he was using the truck, Gibson could exclude all others except Frazier from it. *Thomas*, 447 F.3d at 1199. And like the defendant in *Johns,* Gibson kept his personal property in the truck and had an arrangement with Frazier that allowed him unrestricted use of the truck. 851 F.2d at 1136.

4.       The Inventory Search Was Invalid

"The impoundment of an automobile is a seizure within the meaning of the Fourth Amendment." *Miranda v. City of Cornelius*, 429 F.3d 858, 862 (9th Cir. 2005). "Under the 'community caretaking' doctrine police may, without a warrant, impound and search a motor vehicle so long as they do so in conformance with the standardized procedures of the local police department and in furtherance of a

community caretaking purpose, such as promoting public safety or the efficient flow of traffic." *United States v. Torres*, 828 F.3d 1113, 1118 (9th Cir. 2016).

Gibson argues that the Metro officers' decision to impound the F-150 was not in compliance with Metro guidelines. Metro guideline 5/204.06 provides 12 circumstances under which a vehicle may be impounded. (ECF No. 31-2) At the evidentiary hearing, Metro officers testified that they relied on circumstance number 12 to impound the truck. Circumstance 12 states that a vehicle may be impounded "[i]f there is not a licensed driver in the vehicle and it is not legally parked." (*Id.* at 3) It is uncontested that neither Frazier nor Gibson could have legally moved the truck: Frazier was arrested on an outstanding warrant and Gibson did not have a valid driver's license. Based on the body camera video and the officers' testimony, the F-150 was parked illegally. Although it was parked off to the side of an access road, it was still obstructing the travel lane. An inattentive motorist could have easily hit the truck while turning on to the access road. The court concludes that the officers complied with Metro policy when they decided to impound the truck.

"Once a vehicle has been legally impounded, the police may conduct an inventory search without a warrant." *Torres*, 828 F.3d at 1120. "[I]n order to ensure that the inventory search is 'limited in scope to the extent necessary to carry out the caretaking function,' it must be carried out in accordance with standard procedures of the local police department." *Wanless*, 882 F.2d at 1463 (quoting *South Dakota v. Opperman*, 428 U.S. 364, 369, 96 S.Ct. 3092, 49 L.Ed.2d 1000 (1976)).

"When vehicles are impounded, local police departments generally follow a routine practice of securing and inventorying the automobiles' contents." *Opperman*, 428 U.S. 364, 96 S.Ct. 3092. "These procedures developed in response to three distinct needs: [1] the protection of the owner's property while it remains in police custody; [2] the protection of the police against claims or disputes over lost or stolen property; and [3] the protection of the police from potential danger." *Id.*

In *Wanless*, the Ninth Circuit held that an inventory search was invalid because police officers failed to comply with state law. 882 F.2d at 1464. Under Washington state law, police officers were required to ask the owner of a vehicle if he consented to an inventory search. *Id.* at 1463. The officers did not ask the vehicle's owner whether he consented to the inventory search. *Id.* This departure from state law proved pivotal. *Id.* Since the officers did not comply with state law regarding the consent inquiry, the resulting inventory search was unlawful. *Id.*

Metro policy mandates that "[i]mpounding officers must thoroughly search vehicles and containers located [in the vehicle] per 5/200/04. Personal property must be inventoried on the Vehicle Impound Report." (ECF No. 31-2)

Officers Randall and Dannenberger conducted an inventory search of the truck. Officer Dannenberger's body camera recorded the search. Both officers are observed opening various compartments in the front cab, then proceeding to look through various containers in the rear cab. Shortly after beginning his search of the rear cab, Officer Randall discovered a handgun under the driver's seat. The officers immediately stopped their inventory search and contacted Metro detectives. For the purposes of this motion, it is crucial to emphasize the manner in which the officers conducted their search.

The images and audio on the body camera (Def's Ex. C) are consistent with a general exploratory search, where minimal efforts were made to document areas searched or items discovered. The search departed significantly from Metro's written policy. At no time did either officer document on Metro's Vehicle Impound Report form, which areas were checked or what personal property, if any, was found. At the evidentiary hearing, both officers testified that they did not complete the form as the conducted their search, write down their findings in a notebook, or otherwise memorialize the results of the search. Officer Randall testified that it was his customary practice to remember what items he had

11

found then complete the impound report later. Officer Lane did begin to complete an impound form, but was only able to document the contents of the truck's bed before the handgun was discovered.

The court finds that the officers' conduct was a significant departure from Metro's written policy. Section VII.B.7 of Metro's policy states "[i]n an inventory, all containers and their contents within a vehicle must be documented for the above-stated policy reasons." (Def's Ex. B) The sentence immediately preceding this command states in part, inventory searches "must be done pursuant to standardized criteria which limits the discretion of the officer and ensures that impound/inventory are legally performed and not a guise for a general exploratory search." (*Id.*) Here, the officers' departure from official policy coupled with the manner in which the search was conducted amounts to a general exploratory search, not a valid inventory search. *See Wanless*, 882 F.2d at 1464 (holding that police officers' failure to comply with state law regarding consent to search rendered an inventory search unlawful). All evidence obtained as a result of the inventory search should be suppressed.

5.    <u>Metro Officers Violated Gibson's *Miranda* Rights</u>

The Fifth Amendment guarantees no person "shall be compelled in any criminal case to be a witness against himself." U.S. CONST. amend V. From this guarantee, courts derived the *Miranda* rule, which states that "the prosecution may not use statements … stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege against self-incrimination." *Miranda v. Arizona*, 384 U.S. 446, 444, 86 S.Ct. 1602 (1966). The *Miranda* decision also "established certain procedural safeguards that require police to advise criminal suspects of their rights under the Fifth and Fourteenth Amendments before commencing custodial interrogation." *Duckworth v. Eagan*, 492 U.S. 195, 202, 109 S.Ct. 2875, 106 L.Ed.2d 166 (1984).

"In now-familiar words, the Court said that the suspect must be told that 'he has [1] the right to remain silent, [2] that anything he says can be used against him in a court of law, [3] that he has the right to the presence of an attorney, and [4] that if he cannot afford an attorney one will be appointed for him prior to any questioning if he so desires." *Id.* at 201-02 (1989).

Law enforcement officers are required to give *Miranda* warning only when the defendant is: (1) in custody and (2) subject to an interrogation. *Rhode Island v. Innis*, 446 U.S. 291, 300, 100 S.Ct. 1682, 64 L.Ed.2d 297 (1980).

    a.    *Custody*

The Government does not dispute that Gibson was in custody at the time of the challenged questioning. (ECF No. 23) The only question remaining is whether the officer's statement constituted an interrogation. *Id.*

    b.    *Interrogation*

An interrogation can be either "express questioning or its functional equivalent." *Innis*, 446 U.S. at 300-01. It "refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Id.* at 301. The Government argues that the question, "is there anything else in the vehicle that officers should know about?," did not constitute an interrogation. (ECF No. 23) The court disagrees. The officers question is the type of express questioning that *Miranda* was designed to protect against. *See Innis*, 446 U.S. at 301.

    c.    *Public-Safety Exception*

"In determining whether the public safety exception to *Miranda* applies, '[courts] ask whether there was an objectively reasonable need to protect the police or the public from any immediate danger.'" *United States v. Carrillo*, 16 F.3d 1046, 1049 (9th Cir. 1994)(internal citations omitted).

In *New York v. Quarles*, a police officer arrested a rape suspect in a supermarket. 467 U.S. 649, 651, 104 S.Ct. 2626, 81 L.Ed.2d 550 (1984). While conducting a pat down search, the officer discovered the defendant was wearing an empty shoulder holster. *Id.* at 652. Without *Mirandizing* him, the officer asked the defendant where the gun was. *Id.* The defendant directed the officer to nearby location and said, "the gun is over there." *Id.* The defendant challenged the admission of his statements on the ground that it violated his *Miranda* rights. *Id.* at 653. The Supreme Court disagreed, and in so doing created the "public safety" exception to the *Miranda* rule. *Id.* at 655. So long as officers had an objectively reasonable belief that there was an immediate danger to himself or the public, they do not need to provide *Miranda* warnings before asking questions that could lead to incriminating responses. *Id.* In *Quarles*, the officer had an objectively reasonable belief that such a danger existed. *Id.* The defendant's empty shoulder holster meant that a loaded firearm was somewhere in the grocery store. It would have been easy for an accomplice or member of the public to find and use the gun. *Id.*

In *Carrillo*, a police officer asked the defendant if he had any drugs or needles on his person before conducting a pat down search at the local jail. *Id.* The defendant responded, "No, I don't use drugs, I sell them." *Id.* The district court admitted the statement over the defendant's objections. *Id.* On appeal, the Ninth Circuit held that the officer's question was based on a reasonable concern for his safety. *Id.* The officer had credibly testified that in the past, he had been poked by needles and his bare skin had come into contact with illicit drugs while searching suspects. *Id.* The officer was thus justified to ask his question out of concern for his own safety.

In *United States v. Brady*, a police officer arrested a kidnapping suspect in the middle of high-crime neighborhood. 819 F.2d 884, 885 (9th Cir. 1987). A large crowd had gathered and the officer believed a member of the crowd was armed with a knife. *Id.* During the arrest, the officer asked the defendant if he had gun in his car. *Id.* The defendant replied that there was a gun in the trunk. *Id.* At

trial, the defendant's statements about the gun's location were admitted over his objections. *Id.* at 888. On appeal, the Ninth Circuit held that the statements fell within the public safety exception to *Miranda*. The officer was confronted with a gathering crowd in a high-crime area, some of whom he suspected were armed. *Id.* These circumstances made it reasonable for the officer to conclude there was an immediate danger to himself and bystanders. *Id.*

Here, Metro officers did not have an objectively reasonable belief that there was an immediate danger to themselves or the public. First, there was no threat of a third party finding and using the weapon. No crowd had gathered, *Brady*, 819 F.2d at 886, and the stop was being conducted on a side street with no foot traffic. *See Quarles*, 467 U.S. at 651. The four officer present could have easily detected and prevented any attempt to gain access to the truck.

Second, the officer's question did not demonstrate a concern for safety. He asked, "is there anything else in the vehicle that officer should know about," to which Gibson replied, "[e]verything in the car is mine." (ECF No. 15-1) Unlike the *Quarles* officer or the *Brady* officer, the Metro officer did not specifically ask about a weapon. The phrasing of his question shows a concern for further criminal investigation rather than public safety.

Third, at the time Metro officers had secured all individuals who had been in the truck. Frazier was seated in the rear of Officer Orton's patrol vehicle and Gibson stood in front of the patrol vehicle in handcuffs.

Based on these facts, Metro officers did not have an objectively reasonably belief that there was an immediate threat to themselves or the public. Their questioning falls outside of the public safety exception to *Miranda*. Gibson's statements subsequent to his detention should be inadmissible.

ACCORDINGLY, and for good cause shown,

15

IT IS HEREBY RECOMMENDED that Gibson's motion to suppress (ECF No. 15) should be GRANTED. The handgun and any statements after Gibson was asked, "Is there anything else in the truck we should know about?" should be suppressed.

IT IS SO RECOMMENDED.

DATED this 6th day of March, 2017.

_____
CAM FERENBACH
UNITED STATES MAGISTRATE JUDGE