UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| United States of America,<br><br>  Plaintiff<br><br>v.<br><br>Robert Lee Gibson,<br><br>  Defendant | 2:16-cr-00333-JAD-VCF<br><br>**Order Re: Motion to Suppress**<br><br>[ECF Nos. 15, 41] |

Robert Lee Gibson stands charged with one count of being a felon in possession of a firearm.[1] Gibson moves to suppress the pistol recovered from beneath the seat of the truck that he was a passenger in during an October 2016 traffic stop, as well as statements that he made to Las Vegas Metropolitan Police ("Metro") officers.[2] Gibson argues that Metro officers did not have a legal basis to stop or search the truck, they impermissibly extended the stop, and they elicited incriminating statements from him without providing him *Miranda* warnings.[3]

After an evidentiary hearing, Magistrate Judge Ferenbach recommends that I grant Gibson's motion.[4] He found that the stop was lawful and that the officers did not unreasonably prolong it.[5] Neither party objects to these findings. But he also found that Gibson has standing to challenge the search of the vehicle, that the inventory search was invalid because it did not follow Metro's inventory-search policy, and that officers violated Gibson's rights by not providing him *Miranda*

---

[1] ECF No. 1.

[2] ECF No. 15.

[3] *Id.* at 3.

[4] ECF No. 41.

[5] *Id.* at 4–7.

warnings.[6] Judge Ferenbach therefore recommends that all evidence obtained as a result of the inventory search and all of Gibson's statements be suppressed.[7] The government objects to these findings.[8]

Having reviewed the objected to portions of Magistrate Judge Ferenbach's findings and conclusions de novo, I find that Gibson has standing to challenge the search of the truck, that the search was invalid, and that its fruits must be suppressed. And I agree that Gibson's pre-*Miranda* statements are inadmissible. But I find that Gibson's post-*Miranda* statements are admissible.

**Standard of review**

A district court reviews objections to a magistrate judge's proposed findings and recommendations de novo.[9] "The district judge may accept, reject, or modify the recommendation, receive further evidence, or resubmit the matter to the magistrate judge with instructions."[10] The standard of review applied to the unobjected-to portions of the report and recommendation is left to the district judge's discretion.[11] Local Rule IB 3-2(b) requires de novo consideration of specific objections only.[12] Because the government challenges only Judge Ferenbach's findings that Gibson has standing to challenge the search, that the inventory search was invalid, and that Metro officers violated Gibson's *Miranda* rights and his resulting recommendations that Gibson's statements and all evidence obtained as a result of the inventory search be suppressed, I evaluate only those issues de novo. I adopt all other findings and conclusions without further review.

---

[6] *Id.* at 8–16.

[7] *Id.*

[8] ECF No. 44.

[9] *United States v. Reyna-Tapia*, 328 F.3d 1114, 1121–22 (9th Cir. 2003).

[10] *Id.*

[11] *Id.* (stating that a "district judge must review the magistrate judge's findings and recommendations *de novo if objection is made*, but not otherwise") (emphasis in original).

[12] *See* L.R. IB 3-2(b) (requiring de novo consideration of specific objections only).

**Discussion**

The magistrate judge conducted an evidentiary hearing on the suppression motion and recounted the events established by the evidence in his Findings and Recommendations.[13] Having reviewed the evidence received at, and the transcript of, that hearing,[14] I find that Judge Ferenbach's summary of the events as established by the evidence is accurate. So I adopt the "Background" portion of his Findings and Recommendations in toto, and I do not restate those events here because the parties are familiar with them. I do, however, add several additional details from the events whenever relevant to my analysis.

**A.  Gibson has standing to challenge the search of the truck.**

Gibson argues that he has standing to challenge the search of the truck that he was a passenger in when it was stopped because he had legitimate expectation of privacy in the truck stemming from having: (1) "several items" in the truck; (2) permission from the owner of the truck to use it for two weeks before the stop; and (3) plans and permission to use the truck later on the day of the stop "per their usual arrangement."[15]

The government argues that Gibson did not show that he has a legitimate expectation of privacy in the truck and he therefore lacks standing to challenge the search of it because: (1) he met Frazier, the owner of the truck, only 10 to 14 days prior to the stop and Frazier described him as an "acquaintance" that she did not know well enough to call a "friend"; (2) Frazier stated that she did not know what items Gibson had in the truck and for how long those items were there; (3) Frazier signed a consent to search form authorizing the search of the truck and any possessory interest Gibson had in the truck was subordinate to Frazier's interest; and (4) Gibson "did not present any evidence to support the contention that he had permission to utilize the truck when he slid from the

---

[13] ECF Nos. 33 (minutes), 36 (transcript of hearing), 41 (findings and recommendation).

[14] ECF No. 36.

[15] ECF No. 15; ECF No. 30 at 5; ECF No. 37 at 7–8.

passenger seat over to the drivers seat, turned on the vehicle, and attempted to flee from police."[16]

The magistrate judge concluded that Gibson had a reasonable expectation of privacy in Frazier's truck. He found that Frazier's credible testimony about "Gibson's arrangement with [her] demonstrates that the two had 'joint control' over the F-150"[17] because, "while using the truck, Gibson could exclude all others except Frazier from it"[18] and "Gibson kept his personal property in the truck and had an arrangement with Frazier that allowed him unrestricted use of the truck."[19] Judge Ferenbach, therefore, recommends that I find that Gibson has standing to challenge the search of Frazier's truck.[20]

"To invoke the Fourth Amendment protections, a person must show that he had a legitimate expectation of privacy. A person demonstrates a legitimate expectation of privacy when that person has a: (1) subjective expectation of privacy; and (2) an objectively reasonable expectation of privacy."[21] An expectation of privacy is legitimate if it is one that society accepts as objectively reasonable.[22] "The Fourth Amendment shields not only actual owners [of property], but also anyone with sufficient possessory rights over the property searched."[23] "To be shielded by the Fourth Amendment, a person needs "some joint control and supervision of the place searched, not merely

---

[16] ECF No. 38 at 2–3.

[17] *Id.*

[18] *Id.* (citing *U.S. v. Thomas*, 447 F.3d 1191, 1199 (9th Cir. 2006) (emphasis supplied)).

[19] *Id.* (citing *U.S. v. Johns*, 851 F.2d 1131, 1136 (9th Cir. 1988)).

[20] *Id.*

[21] *U.S. v. Shryock*, 342 F.3d 948, 978 (9th Cir. 2003) (citing *Smith v. Maryland*, 442 U.S. 735, 740 (1979).

[22] *See Minnesota v. Olson*, 495 U.S. 91, 95–96 (1990); *California v. Greenwood*, 486 U.S. 35, 39 (1988).

[23] *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1186 (9th Cir. 2015).

permission to be there."[24]

Two cases—*Rakas v. Illiniois* and *U.S. v. Portillo*—sketch out the boundaries of the privacy expectations at issue here. In *Rakas*,[25] the Supreme Court held that two passengers lacked standing to challenge the search of the car in which a sawed-off rifle was found under the front passenger seat and a box of ammunition was discovered in the glove box. The *Rakas* defendants "conceded that they did not own the automobile and were simply passengers."[26] The High Court reasoned that the areas searched were "areas in which a passenger *qua* passenger" simply would not normally have a legitimate expectation of privacy."[27]

In *Portillo*,[28] the Ninth Circuit applied *Rakas* to determine whether two armed-bank-robbery defendants had reasonable expectations of privacy in the contents of the trunk of a borrowed car. The panel found that the passenger Portillo was "in the same position" as the *Rakas* defendants: "merely a passenger, . . . he does not possess an expectation of privacy [that] the fourth amendment was designed to protect."[29] But the driver Montellano was in a materially different position. He:

> had both permission to use his friend's automobile and the keys to the ignition and the trunk, with which he could exclude all others, save his friend, the owner. Montellano, therefore, possesses the requisite legitimate expectation of privacy necessary to challenge the propriety of the search.[30]

The Ninth Circuit further distilled the rule in *U.S. v. Thomas*: "a defendant who lacks an ownership interest may still have standing to challenge a search, upon a showing of 'joint control' or 'common authority' over the property searched. . . . Common authority rests 'on mutual use of the property by

---

[24] *Id*. at 1187.

[25] *Rakas v. Illinois*, 439 U.S. 128 (1978).

[26] *Id*. at 130.

[27] *Id*. at 148–49.

[28] *U.S. v. Portillo*, 633 F.2d 1313 (9th Cir. 1980).

[29] *Id*. at 1317.

[30] *Id*.

persons generally having joint access or control for most purposes.'"[31] Thus, in the Ninth Circuit, "a defendant may have a legitimate expectation of privacy in another's car if the defendant is in possession of the car, has the permission of the owner, holds a key to the car, and has the right and ability to exclude others, except the owner, from the car."[32]

The facts of this case occupy the grey area between *Rakas* and *Portillo*. Gibson was a passenger at the time of the stop, but he was no mere passenger. As the magistrate judge found and Frazier's testimony at the evidentiary hearing established, Gibson had the owner's express permission to use the truck: she acknowledged that she had voluntarily surrendered "control" over the truck "maybe 10 days" or "a couple weeks" earlier.[33] Their arrangement[34] was that Gibson "would use it and [Frazier] asked him just to make sure that [she] got to work on time every day," so Gibson was "sort of [her] chauffeur for a little bit."[35] "He had the keys. He came and picked [her] up for work when [she] needed to go there every day."[36] Frazier also testified that Gibson was keeping some of his belongings in the car.[37] And when asked by the prosecutor whether the truck was "mainly" in her "possession" during this time period, Frazier made it clear that it was not:

A: No. He had come to pick me up that day and I was driving to work.

Q: So where was the vehicle being kept?

---

[31] *Thomas*, 447 F.3d at 1198 (quoting *U.S. v. Cormier*, 220 F.3d 1103, 1108 (9th Cir. 2000), and *Illinois v. Rodriguez*, 497 U.S. 177, 181 (1990)) (holding that "an unauthorized driver [of a rental car] only has standing to challenge the search of a rental automobile if he received permission to use the rental car from the authorized renter").

[32] *Id*.

[33] ECF No. 36 at 226–27 (transcript of Frazier testimony).

[34] *See Johns*, 851 F.2d 1131 (quoting *U.S. v. Broadhurst*, 805 F.2d 849, 851–52 (9th Cir. 1986), and holding that "[a] 'formalized arrangement among defendants indicating joint control and supervision of the place is sufficient to support a legitimate expectation of privacy'").

[35] ECF No. 36 at 228.

[36] *Id*. at 235–36.

[37] *Id*. at 228. Gibson also told officers at the scene that all the items in the care were his. *Id*. at 252.

| | | |
|---|---|---|
| 1 | A: | He was using it. |
| 2 | Q: | I know, but where—I mean, where did you keep the vehicle on a day-to-day basis? Did you park it in your garage? Did you keep it on the street? |
| 3 | | |
| | A: | Between when he was using it? I don't know where it was. |
| 4 | | |
| | Q: | You don't know where your vehicle was? |
| 5 | | |
| | A: | He came to pick me up for work during the day for the last several days that he had |
| 6 | | the vehicle. |
| 7 | Q: | So you don't know where the vehicle was being housed or kept for safekeeping? |
| 8 | A: | No.[38] |

Based on Frazier's testimony—which the magistrate judge found credible and I have no reason to disregard—I find this case more analogous to *Portillo* than *Rakas*. Gibson was not merely a "passenger *qua* passenger."[39] He had continued permission to use the truck, and he had at least "joint control and supervision" over it at the time of the stop.[40] I thus find that Gibson had a legitimate expectation of privacy in the under-seat contents of the truck, and he enjoys standing to challenge its search.

**B.     The inventory search was invalid.**

Because Gibson has standing to challenge the search of the truck, I next consider whether the inventory search passed constitutional muster. Inventory searches, justified by law enforcement's community-caretaking function, are a well-recognized exception to the warrant requirement.[41] But

---

[38] *Id*. at 236.

[39] *Rakas*, 439 U.S. at 149.

[40] *Lyall*, 807 F.3d at 1187 (holding that organizers of an event at a borrowed warehouse, who had received permission from the owner to use it and were in charge of the premises at the time of the search, enjoyed a Fourth Amendment interest in it). The government argues that Gibson "did not present evidence . . . that he had permission to utilize the vehicle when he slid[] from the passenger seat over to the driver seat, turned on the vehicle, and attempted to flee from police." ECF No. 38 at 3. But the evidence established that Frazier had given him permission to use the truck and at least joint control over it for the drive to work, and there is no evidence that suggests that the scope of that permission and control was changed between the stop and Gibson's seat change.

[41] *Colorado v. Bertine*, 479 U.S. 367, 371 (1987).

they must be performed in strict accord with the police department's constitutionally sufficient, standard procedures to ensure that the search is not just a "ruse for a general rummaging to discover incriminating evidence."[42]

Even if I assume without deciding that the officers properly impounded Frazier's truck, and that Metro's inventory-search policy was "reasonably 'designed to produce an inventory,' and ensures sufficient uniformity to protect the owners and occupants of impounded vehicles from the risk that officers will exercise discretion in performing an inventory search only when they suspect they will uncover fruits of criminal activity,"[43] the search itself was still illegal. Standardized "inventory procedures serve to protect an owner's property while it is in the custody of the police, to insure against claims of lost, stolen, or vandalized property, and to guard the police from danger."[44] And the Supreme Court has ruled that these "strong governmental interests and the diminished expectation of privacy in an automobile" justify inventory searches of impounded vehicles.[45]

But inventory procedures must be "administered in good faith" to satisfy the Fourth Amendment.[46] And "to determine whether the evidence secured through [an] inventory search[] . . . is admissible in federal court, we must determine whether the search[ was] conducted in accordance with the standard procedures of" the police department.[47] So, in *U.S. v. Torres*, the Ninth Circuit panel validated an inventory search of a vehicle in which a Metro officer found a handgun in the engine's air-filter compartment. The panel found that Metro's inventory-search policy was "designed to produce an inventory" and discourage evidence rummaging and that the officer—who

---

[42] *Florida v. Wells*, 495 U.S. 1,4 (1990).

[43] *U.S. v. Torres*, 828 F.3d 1113, 1122 (9th Cir. 2016) (finding the Las Vegas Metropolitan Police Department's inventory-search policy, and the well-documented search conducted under it, consistent with the Fourth Amendment).

[44] *Id*. at 372.

[45] *Id*.

[46] *Bertine*, 479 U.S. at 374.

[47] *U.S. v. Wanless*, 882 F.2d 1459, 1463–64 (9th Cir. 1989).

had prepared a departmental Vehicle Impound Report" that required him to check the engine—"acted within the parameters" of that policy.[48] In *U.S. v. Wanless*, the Ninth Circuit held that the inventory search of two cars was illegal because Washington State law prohibited troopers from conducting an inventory search without first asking the owner of the impounded car if he would consent to the search, and that procedure was not followed.[49]

As the magistrate judge accurately described, the so-called inventory search of Frazier's truck departed significantly from Metro's department policy.[50] The policy required officers to "conduct an inventory search of th[e] vehicle and containers found therein and report all personal property on the LVMPD 503 Vehicle Impound Report."[51] And it reminded them that the inventory search "must be done pursuant to standardized criteria which limits the discretion of the officer and ensures that impound/inventory are legally performed and not a guise for a general exploratory search."[52] But it does not appear from the record in this case that officers Randall and Dannenberger were reporting personal property on the LVMPD 503 Vehicle Impound Report as required by department policy. Officer Dannenberger testified that he does not write down anything when he takes inventories, unless it's of "major value."[53] But even though he found jewelry in this truck, he didn't write it down.[54] Officer Randall similarly testified that he "typically" does not write down the items he sees during an inventory search; he just "keep[s] a memory of it."[55] Nobody ever "made it to" the part of

---

[48] *Torres*, 828 F.3d at 1117, 1122.

[49] *Wanless*, 882 F.2d at 1463–64.

[50] ECF No. 41 at 11–12.

[51] ECF No. 35 at 5 (Metro policy, § VI(B)(7)).

[52] *Id*.

[53] ECF No. 36 at 152–53.

[54] *Id*. at 153.

[55] *Id*. at 245.

the form with "the actual inventory of the property and the details of the vehicle and what's inside."[56] So the form was probably "passed off to detectives or it was shredded and recycled."[57]

A documented list or catalog of items is the hallmark of an inventory search,[58] and so it must be to cabin discretion and justify dispensing with the warrant requirement.[59] The officers' testimony at the evidentiary hearing and the body camera images from their search show that this critical feature was missing from this search, suggesting that it was really just a general exploratory search conducted without the required warrant or another exception.[60] All evidence obtained as a result of the inventory search must be suppressed.[61]

**C.  Gibson's statements after he was read his *Miranda* rights are admissible, but his pre-*Miranda* statement is not.**

The magistrate judge next recommends that I find all the statements Gibson made after he was detained, including his statement that "[e]verything in the car is mine," inadmissable because the officers did not have an objectively reasonable belief that there was an immediate threat to themselves or the public to satisfy the public safety exception to *Miranda* when they asked Gibson if there was "anything" in the truck that they should know about.[62]

---

[56] *Id*. at 253–54.

[57] *Id*. at 254, 264.

[58] *U.S. v. Frank*, 864 F.2d 992, 1004 (3d Cir. 1988) (cited with approval in *U.S. v. Penn*, 233 F.3d 1111, 1117 (9th Cir. 2000) ("Use of the term "inventory" of necessity defines its scope"; "it necessarily implies a detailed account, catalog or schedule").

[59] *See Bertine*, 479 U.S. at 372 (recognizing that the legitimate governmental interests of protecting an owner's property and protecting police from property claims outweigh an individual's Fourth Amendment rights).

[60] The government has noted that Frazier signed a consent to search the truck, but that consent was obtained after the officers found the gun during the "inventory search," and the government does not argue that the gun was lawfully obtained (or would have been inevitably discovered) during a consent search.

[61] *U.S. v. Wanless*, 882 F.2d at 1464.

[62] ECF No. 41 at 15 (citing ECF No. 15-1).

The government objects and argues that none of Gibson's statements should be suppressed. The Government first argues first that Gibson's pre-*Miranda* statement that "everything in the car is mine" should not be suppressed because it was not the result of, or made in response to, an interrogation.[63] The government admits that Gibson made the statement while standing in front of a patrol vehicle in cuffs and that it was made after Officer Layne asked if there was anything in the truck he should know about, but it submits that Gibson did not immediately respond to the question. Instead, Gibson was talking to himself and murmuring under his voice and did not make the statement until he noticed that officers were walking toward the truck.[64] The government also argues, in the alternative, that Officer Layne's question to Gibson falls under the public-safety exception to *Miranda* because Gibson had "admittedly tried to ram the patrol car and flee the scene"[65] prior to the traffic stop being completed. Finally, the government argues that Gibson's statements that he made after Detective McClelland read the *Miranda* warnings should not be suppressed because "there was no deliberate two-step interrogation technique utilized [that] would require suppression" because Officer Layne and Detective McClelland's interrogations "were separated in time, location, and conducted by different individuals."[66] Gibson responds that Judge Ferenbach properly suppressed all of his statements after he was asked if there is anything else in the truck they should know about because the government did not meet its burden of proving knowing and voluntary waiver of his *Miranda* rights.[67]

"The prosecution may not use statements . . . stemming from custodial interrogation of the defendant unless it demonstrates the use of procedural safeguards effective to secure the privilege

---

[63] ECF No. 44 at 11.

[64] *Id.* (citing ECF No. 36 at 251–52).

[65] *Id.* at 12.

[66] *Id.*

[67] ECF No. 49 at 11.

against self-incrimination."[68] *Miranda* warnings are not required where "a suspect is simply taken into custody, but rather where a suspect in custody is subjected to interrogation. 'Interrogation,' as conceptualized in the *Miranda* opinion, must reflect a measure of compulsion above and beyond that inherent in custody itself."[69] "Any statement given freely and voluntarily without *any* compelling influences is . . . admissible in evidence. The fundamental import of the privilege while an individual is in custody is not whether he is allowed to talk to the police without the benefit of warnings and counsel, but whether he can be interrogated."[70]

"*Miranda* safeguards come into play whenever a person in custody is subjected to either express questioning or its functional equivalent. That is to say, the term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect."[71] When determining whether the questioning rises to the level of an interrogation, a court "focuses primarily upon the perceptions of the suspect, rather than the intent of the police."[72]

### 1. Gibson's pre-*Miranda* statement

It is undisputed that Gibson was detained in handcuffs in front of Officers Orton and Dannenberger's patrol car when he made the statement that "everything in the truck is mine." It is also undisputed that Gibson was not Mirandized prior to making this statement; he did not receive a *Miranda* warning until an hour and fifteen minutes after the stop had occurred, when Detective McClelland arrived on the scene.[73] Officer Layne testified at the evidentiary hearing that while

---

[68] *Miranda v. Arizona*, 384 U.S. 436, 446 (1966).

[69] *Rhode Island v. Innis*, 446 U.S. 291, 300 (1980) (quoting *Miranda*, 384 U.S. at 479).

[70] *Id.* (quoting *Miranda*, 384 U.S. at 478) (emphasis supplied).

[71] *Id.* at 301.

[72] *Id.*

[73] *See* ECF No. 36 at 37 (Detective McClelland testified that the stop occurred at around 1:21 PM, that she arrived at around 2:21 PM, and that she did not speak to Gibson until 15 minutes after she arrived).

Gibson was detained in front of the patrol car, he asked Gibson a series of three questions purportedly "for officer safety."[74] First, Officer Layne testified that while he was patting Gibson down, he asked Gibson "is there anything sharp on you that will poke me."[75] Next, after Officer Layne found what he said "looked like a security badge" in Gibson's pocket, he asked "what is that for?"[76] Finally, Officer Layne asked Gibson "is there anything in the car?"[77] Officer Layne testified that he asked Gibson this third question so that when the officers performed the inventory search of the vehicle, they would "have a heads-up of what they're kind of walking into. If there's blood, or weapons or knives or anything that can harm them, [such as] explosives . . . ."[78]

Officer Layne testified that "[Gibson] wasn't really responding to most of the questions" and, instead, he "just kind of paused there . . . talking to himself a little bit, murmuring stuff under his voice" and "then eventually when Officers Dannenberger and Randall went to the patrol vehicle, [Gibson] looked over at them, noticed that they were walking towards the F-150 and then said 'everything in the car is mine, or everything in the vehicle is mine.'"[79] Officer Layne testified that he relayed this information to his fellow officers and then did not ask Gibson any other questions.[80]

Gibson's statement did not relate in any way to Officer Layne's first two questions of whether there were any sharp objects in Gibsons pockets and what the nature of badge was. So, I focus my analysis on Officer Layne's third question of whether there was "anything" in truck he should know about. It cannot be said that Gibson's statement was made without *any* compelling influences. Although Officer Layne testified that the purpose of asking Gibson this question was to

---

[74] *Id.* at 251.

[75] *Id.*

[76] *Id.*

[77] *Id.*

[78] *Id.* at 252.

[79] *Id.* at 251–52.

[80] *Id.* at 253.

learn if there were specific dangerous items that could harm the officers who were going to perform the inventory search, Officer Layne's specific intent in asking this question—which he did not communicate to Gibson—does not control my analysis. Rather, I must determine whether Gibson could have perceived the question to have encompassed items of incriminating nature, such that Gibson could have provided an incriminating response to the question. I conclude that Gibson could have perceived that Officer Layne's question sought to discover incriminating information. I also find that Officer Layne should have known that his question was reasonably likely to elicit an incriminating response from the Gibson. Therefore, I consider whether the public-safety exception applies to Officer Layne's question and saves Gibson's response from exclusion.

I am unpersuaded by the government's argument that Gibson's act of sliding over into the driver's seat and attempting to back into the patrol car presented a true threat to officers and the public that triggered the public-safety exception. Any threat that Gibson posed to the officers and the public disappeared after Gibson turned off the truck, threw the keys out truck window, and was placed in handcuffs and surrounded by four officers. Plus, Officer Layne's failure to ask Gibson any follow-up questions in response to Gibson's vague answer that "everything in the truck is mine," cuts against the government's argument that Layne's question falls under the public-safety exception. If the officer perceived a serious threat of danger to police and the public, he likely would have asked Gibson additional questions after Gibson's vague answer, which provided no useful public-safety information.[81] I thus find that the public-safety exception does not save Gibson's un-Mirandized statement from exclusion.

### 2. *Gibson's post-warning statements*

But I do not reach the same conclusion about his later, post-warning statements to Detective McClelland.[82] Detective McClelland testified at the evidentiary hearing that upon arriving at the scene, she "made contact with the primary patrol officers and they briefed [her] on the information

---

[81] ECF No. 36 at 253.

[82] The Report and Recommendation does not distinguish between the pre- and post-warning statements. *See* ECF No. 41 at 12–15.

they had in reference to their car stop as it related to the butt of the firearm that they saw was in the vehicle during their inventory search."[83] She next spoke with Frazier, who told her that "the vehicle belonged to her and that she had no idea of any property that was in the vehicle that belonged to the male passenger,"[84] and Frazier then consented in writing to the search of the truck by signing a Consent to Search form.[85] McClelland testified that "based on the information that [she] received from patrol officers and after speaking with [ Frazier] and being advised by her that the property in the vehicle did not belong to her," she then spoke to Gibson roughly an hour and fifteen minutes after the stop occurred.[86]

Detective McClelland testified that she provided Gibson *Miranda* warnings before asking him any questions and that Gibson replied that he understood his rights.[87] She testified that she then asked Gibson a question "briefly in reference to the property that was inside the vehicle," to which Gibson "didn't specifically say that the firearm itself was his; he just kept repeating that the property in the vehicle was his," that Frazier was not aware of any of the property he had in the vehicle, and that "[Frazier] was not involved."[88] Detective McClelland testified that she also asked Gibson what happened earlier on when he "potentially attempted to flee the area," and that Gibson replied that "his intentions were when he got into the driver's seat of the vehicle and attempted or thought that he would back into the patrol car that was parked behind him and attempt to flee," but that he was unable to do so because the parking brake was on.[89]

A "suspect who has once responded to unwarned yet uncoercive questioning is not thereby

---

[83] ECF No. 36 at 12.

[84] *Id.* at 15.

[85] *Id.* at 15, 20.

[86] *Id.* at 21.

[87] *Id.* at 21–23.

[88] *Id.* at 26.

[89] *Id.*

disabled from waiving his rights and confessing after he has been given the requisite *Miranda* warnings."[90] Rather, "absent deliberately coercive or improper tactics in obtaining the initial statement, the mere fact that the suspect has made an unwanted admission does not warrant a presumption of compulsion" with regard to a post-warning confession and "once warned, the suspect is free to exercise his own volition in deciding whether or not to make a statement."[91]

A "court must suppress post-warning confessions obtained during a deliberate two-step interrogation where the midstream *Miranda* warning—in light of the objective facts and circumstances—did not effectively apprise the suspect of his rights."[92] In determining whether the interrogator deliberately withheld the *Miranda* warning, a court "should consider any available subjective evidence, such as an officer's testimony, [to] support an inference that the two-step interrogation procedure was used to undermine the *Miranda* warning," as well as objective evidence, "includ[ing] the timing, setting and completeness of the pre-warning interrogation, the continuity of police personnel and the overlapping content of the pre-and post-warning statements."[93]

Here, the subjective and objective evidence does not support a conclusion that a deliberate two-step interrogation was used. Officer Layne's subjective testimony reveals that he asked Gibson questions for the purpose of ensuring police and public safety, while the objective evidence from this interrogation reveals that it consisted of only three questions and occurred while patting Gibson down just seconds after he was detained. This weighs against finding that this was a deliberate two-step interrogation procedure.

And although there is some dispute between the parties about how much time lapsed between the two interrogations, Officer Layne's testimony at the evidentiary hearing that he asked Gibson the three safety questions "while conducting a search of him while he was in front of the patrol

---

[90] *Oregon v. Elstad*, 470 U.S. 298, 318 (1985).

[91] *Id.* at 308, 314.

[92] *U.S. v. Williams*, 435 F.3d 1148, 1158 (9th Cir. 2006).

[93] *Id.* at 1158–59.

vehicle,"[94] taken with the video evidence of the stop showing Officer Layne patting Gibson down in front of the patrol vehicle roughly 10 minutes and 17 seconds after the stop occurred,[95] plus Detective McClelland's testimony that she talked to Gibson roughly one hour and fifteen minutes after the stop, reveals that roughly one hour passed between the two interrogations. This lack of temporal proximity between the two interrogations also cuts against Gibson's argument that a two-step interrogation procedure was utilized. Accordingly, when the totality of the subjective and objective evidence is viewed together, it is clear that a two-step interrogation procedure was not used to undermine the *Miranda* warning.

Gibson argues that the issue is not timing but "whether the government proved waiver" of his *Miranda* rights.[96] I disagree. Detective McClelland testified that, before she questioned Gibson, she read him his rights directly from the department's *Miranda* card, which was also admitted into evidence.[97] And she testified that Gibson acknowledged that he understood those rights before answering her questions. The government made the required showing that Gibson was read and waived his rights.[98] Accordingly, I find that Gibson's post-*Miranda* statements were made after a knowing, voluntary, and intelligent waiver of rights and should not be excluded, and I sustain the government's objection to the report and recommendation in this regard only.

## Conclusion

Accordingly, IT IS HEREBY ORDERED that the government's objections to Judge Ferenbach's report and recommendation **[ECF No. 44] are SUSTAINED in part**, as explained above, and Judge Ferenbach's recommendation **[ECF No. 41] is ADOPTED except to the extent that it recommends suppression of Gibson's post-*Miranda* statements.**

---

[94] ECF No. 36 at 250–51.

[95] *See* ECF No. 23-1 (video of the stop).

[96] ECF No. 49 at 9.

[97] ECF No. 36 at 21–23 (McClelland testimony); 34 at 8 (card).

[98] *See United States v. Loucious*, 847 F.3d 1146 (9th Cir. 2017) (holding that Metro's *Miranda* warnings with even less detail than the one reads here were constitutionally sufficient).

IT IS FURTHER ORDERED THAT Gibson's motion to suppress **[ECF No. 15]** is **GRANTED in part**:

- All evidence discovered as a result of the inventory search of the truck is SUPPRESSED;
- Gibson's pre-*Miranda* statement to Officer Layne is SUPPRESSED; and
- Gibson's motion is denied in all other respects.

Dated August 9, 2017

_____
Jennifer A. Dorsey
United States District Judge